Good morning, your honors. Lynn Panagakos on behalf of George Lindell. Seated with me at council table is Cynthia Kakiwata, who represents Mr. Lindell's daughter, Holly Ho'i'i. We plan to divide our argument time as follows. I plan to argue for ten minutes, followed by Ms. Kakiwata for seven minutes. I plan to save three minutes for rebuttal. I know I need to watch my time. We plan to rest on our briefs with regard to the Keith Cunningham evidence and Ms. Ho'i'i's sentencing issues. Ms. Kakiwata plans to argue the constructive amendment issue, which dovetails with the issues related to the securities allegations and securities evidence. I plan to argue the Sixth Amendment issues arising from the Supreme Court's March 2016 decision in Luis v. United States, and Ms. Kakiwata will argue the specific application of that Luis decision to her client. Luis was decided after the jury verdicts and prior to the sentencing in this case. I was appointed after the jury trial prior to Luis. Luis held for the first time that pretrial restraint on untainted assets needed to retain counsel of choice violates the Sixth Amendment. Counsel, are these funds untainted if they are both a vehicle for the perpetuation of the fraud and the money laundering and also the recipient of the proceeds that are then commingled with what may have been untainted funds before? Your Honor, our argument is that the untainted portion, the non-proceeds, are untainted. Well, the problem is that the Supreme Court has recognized that when tainted funds are deposited and commingled in an account, it taints the entire account. And here, as I understand the proof of the scheme and artifice to defraud, the account itself was one of 16 accounts that were a vehicle, a washing machine, if you will, for the money laundering scheme that the government advocated at trial. So doesn't that distinguish this case from the facts in Luis where the funds were completely untainted? I don't believe so, Your Honor. In the decisions that discuss tainted funds commingling with untainted funds, tainting the entire account, that's for purposes of 18 U.S.C. 1956A. It's not for purposes of proceeds forfeiture. Well, except that the evidence showed that this account was the repository of both of some of the proceeds from the Ponzi scheme and I'm trying to remember, I guess not substitute assets. I'm trying to remember what the second theory for forfeiture is. I guess indirect. Indirect. The theory for forfeiture now after Luis is that the entire account is property involved in a money laundering offense. But that's not the basis upon which it was seized and it was not charged in the indictment. Well, the affidavit in support of the seizure, though, cited two subsections, A1 and A2, right? The affidavit in support of the seizure cited 18 U.S.C. 981A1C, which is the civil forfeiture of proceeds statute, and it cited 982A2, which is the criminal proceeds forfeiture statute, not the property involved in the money laundering. Okay, but then the indictment came down and alleged a criminal forfeiture, did it not? The original indictment alleged a criminal forfeiture. It alleged that the entire account was subject to forfeiture. That's a forfeiture notice, not a finding of probable cause. Right. It alleged that the entire account was subject to proceeds forfeiture. Well, the grand jury makes the determination of probable cause with regard to what property may be forfeited. I don't believe so. That's not what's required by Federal Rule of Criminal Procedure 32, I think it's 32.2. Right. And the Cosme case out of the Second Circuit cited talked about how a forfeiture notice is not a finding of probable cause. Well, why would the grand jury then be presented with the question at all if there's not a probable cause? The forfeiture notice is required to go on the indictment. Right, because the government's theory is that there's probable cause to believe that it constitutes proceeds from the Ponzi scheme. Well, that's the government's theory. Is that a probable cause determination that the grand jury makes? I don't believe so. It's a forfeiture notice. It's not a count that the grand jury is asked to vote on. But you would never get the notice unless the grand jury makes the determination. That's what I'm wrestling with. Okay. Otherwise, there would be no reason to notify the criminal defendant that the property is subject to forfeiture. The government would just proceed under a separate and concurrent or collateral civil action under the civil forfeiture statute. It's a procedural due process requirement to provide notice. But if you look at federal rules. Doesn't the civil forfeiture statute provide after 90 days or whatever the statutory period is in civil forfeiture that if a grand jury indictment is returned, you're not entitled to a probable cause hearing? The civil forfeiture statute also requires that the 18 U.S.C. 983A3B requires the government to obtain an indictment. If they don't file a civil forfeiture complaint, they have to do two things. Obtain an indictment that alleges that the entire account is subject to forfeiture and take the steps necessary to maintain custody of the property under the applicable criminal forfeiture statute. But if the grand jury fails to act under the civil forfeiture statute, you're entitled to a probable cause hearing, are you not? At the end of 90 days? At the end of 90 days, if they don't file a civil forfeiture complaint or a criminal indictment and take the steps necessary, the government has to give it back. So why should I not conclude from the statutory scheme that Congress has enacted that the grand jury has made the determination through the indictment that this property is subject to criminal forfeiture and therefore under the criminal forfeiture statute must include a notice to the property owner of the fact that it may be forfeited criminally? Why you shouldn't conclude that, I would just point, Your Honor, to 32.2 subparagraph A and U.S. v. Cosme out of the Second Circuit. But 983A3B says two things. You have to get the indictment and you have to take the steps necessary. And take the steps necessary to comply with the criminal forfeiture statute. The criminal forfeiture statute cited in the original indictment require compliance with 21 U.S.C. 853. Let me ask you a separate question. Why didn't you make, I say you, but why didn't counsel for Mr. Lindell make a motion pre-trial to raise the request that the funds be released for the engagement of the property? Well, first of all, the government did not comply with its discovery obligation and did not produce the affidavit. But he was notified. I understand that. He had noticed. I understand that. He knew at the time that the court entered the freeze order that the account had been seized. I understand that, Your Honor. But the government is under an order by virtue of Criminal Local Rule 16.1 to produce the affidavit since it obtained this property belonging to the defendant. And they didn't comply with their obligation. So why wouldn't we invoke Rule 12 because he failed to properly and timely file a pre-trial motion in the case? Your Honor, this, Luis is the first time that the Sixth Amendment right to use these untainted funds. It's not the first time that a defendant has asked a district court for relief from the freeze so that the funds can be used for engagement. No, it's the first time that the Supreme Court has recognized a constitutional right. If Luis applies to this situation. Right. And now we're back to the question that I started with, which is whether or not Luis even applies to tainted funds. Right. So, Your Honor, the original indictment does not suffice to take the steps necessary to maintain custody of the property under the applicable forfeiture statute. 21 U.S.C. 853 E and F say the government has to get a restraining order or a warrant. And the warrant that they got did not authorize seizure of the property as property involved in a money laundering offense. Now, if you want to talk about what the grand jury found with regard to that forfeiture notice, the forfeiture notice with regard to the proceeds allegation was just plain false. The forfeiture notice said that the entire account was subject to forfeiture as proceeds when the government knew full well at the time they obtained that first indictment that at least $127,000 predated the crime and therefore was not proceeds. As I understand it, the scheme here was alleged to have occurred over a period of 2005 to 2010 or so. The first parking lot deposit that Ms. Otsuka, the government's expert, identified was November 8, 2005. Ms. Otsuka classified it. And the account was opened in 2009? The IRA was opened in 2009. It received a rollover contribution from a 401K plan that had been opened in 1998. Okay. And then over the course of the alleged Ponzi scheme, $28 million was washed through 16 different accounts. The 401K plan existed from 1998 until November 2005, many years prior to the alleged start of the parking lot. But money went into that account during the scheme, right? $27,000 was traced from the parking lot into the IRA. Thereby commingling and tainting those funds. Commingling but not tainting. Well, I'm not sure. I don't know how you can declare it's not tainted if it's commingling. Well, okay, because here's why. I mean, it's like you just put poison in the soup. Well, no, because Garcia-Guizar, first of all, says that if you have proceeds commingled with non-proceeds, it doesn't render the non-proceeds tainted. What, because money is fungible? No, yeah, I mean, the Garcia-Guizar case is out of the Ninth Circuit, and it just says you have to trace proceeds in order to have proceeds forfeiture. Now, after the original indictment, they dropped the other allegation, that the entire account was tainted as property involved in a money laundering offense. They dropped it. So they never initiated a civil forfeiture action on that theory. They never obtained a warrant to seize it on that theory. And by the time of the first superseding indictment, they were no longer seeking criminal forfeiture on that theory. Taint under Luis means forfeitable. If I might, could I break in here? I appreciate you two have had a great conversation. And I totally lost track of my time. Well, I will account for it. Thank you. I'm just trying to figure out why you had to wait for Luis. We had Rapinski on the books, and Rapinski seems to give you everything that you had to have under Luis, and nobody did anything about it. Why have I got to wait for Luis? You're correct about Rapinski. But why is it that we have a problem? Because Rapinski has been on there forever. Well, Rapinski doesn't say that it's a Sixth Amendment issue. Nonetheless, it does say lots of stuff about whether untainted funds can be restrained prior to conviction. I understand that. And therefore, at that point in time, I'm saying to myself, why, after getting the first superseding indictment, didn't somebody have to move? Your Honor, I wasn't there. I can't speak to that. Well, I appreciate that. But we do have the declaration of Mr. Lindell, who says he was never told about his right. We also have the declaration from his retained counsel, who said that when the money was seized, he just said, you've got to go to the federal PDs, nothing I can do for you anymore. So that's what we have on the record of that. We have Mr. Hayakawa's declaration, we have Mr. Lindell's declaration, and we have Mr. Wolf at the initial appearance in this case saying the account was seized and therefore is not available to him. So the record shows that Mr. Lindell was not given notice of this right until Luis. And when he heard of that decision, he called me right away and said, I didn't know about this, what can we do? I want my rights under this. And so when his constitutional right was recognized, it was not a Sixth Amendment right before that. There's three dissenting opinions in Luis. The Eleventh Circuit and the District Court held contrary to that. The District Court and Marshall said it's a sea change in the law. So now when that right is recognized, Right, but you are perfectly free to argue for sea changes in the law. Yes, you are. Nobody ever said boo. Nobody ever said, Your Honor, we think that injustice is being done here. We'd like to free up these funds. Right, but when Luis was decided, I did say that. And Rule 33 gave me the right to file a motion for new trial if the interest of justice required it. And where there's structural error like this, the interest of justice requires it. The government says that we didn't go under Rule 33 because it wasn't timely. They waived their right to. And so you're asking this court today to do what? To send this back for an evidentiary hearing or simply to send it back for new trial? At minimum, to send it back to prior to the motion to vacate guilty verdicts because the money should have been returned when the immediate release. There were two motions. Motion for immediate release of untainted portion of seized asset. That should have been granted because there was no warrant. And Rapinski applied. At what point was that motion made? That motion was made first. After Luis, the motion for immediate release of untainted portion. Okay. And counsel of choice was asserted for the motion to vacate guilty verdicts. That was denied. So at minimum, it has to go back to that point. If you could settle down just a minute. It seems to me you're getting very excited. Oh, well, then sit down. She's going to have her time. My worry about this is that you've got two things to show. The funds were untainted. You and Judge Tallman have had a lot of conversation about that. But the second is they were needed to retain as counsel of choice, even after we get to Luis. And that was all under Rapinski as well. So how do I know that these funds were needed to retain counsel of choice? Because prior to the seizure, he had counsel of choice. It was this seizure that caused his counsel of choice.  reasonable living expenses? He didn't know. He wasn't told about his Sixth Amendment right. Well, but just a minute, just a minute. Didn't the trustee attempt to garnish the funds in satisfaction of the judgment? The trustee garnished the same funds that are subject to the special forfeiture verdict. The settlement agreement with the trustee allowed Mr. Lindell to retain the entire retirement account except for the two July 2007 transfers, which are the same two. The problem that I have is that it seems to me that your counsel is making a great argument after Luis, but nobody thought about it before Luis, and Rapinski was on the book. And so I have a tough time understanding why I should determine on appeal that these funds were needed to retain counsel of choice. Why should I not at best? Your best argument is to send this back for a hearing by the district court as to whether the funds were needed at all. Well, at minimum, we should have had that. That should be the minimum you should ask for. I mean, I don't know how we could get around. If you win, that's the best you can get in my book. Tell me why I'm wrong. Well, I think the record shows that he would have used those. First of all, he had counsel of choice. He only qualified. He had counsel of choice, but the problem is that he never asked for these funds for counsel of choice. He never did anything about that until Luis comes out and he gets you, a smart person who comes in and tells him, now you got a great argument, and now he starts making it as if it is. I don't know that that's truly so. So I say to myself, your best argument is send it back to see whether it really was his idea. That would be the best you've got. I'm trying to say why is that not your best? I think the record shows that he submitted a declaration at that time, coupled with Mr. Wolf's statement at the initial appearance that the funds were not available to him. Plus, if he had the $225,000 that was not proceeds, he wouldn't have even qualified for court-appointed counsel. So, I mean, he had private counsel. That's a great argument, but also could be made the other side of this, which is he didn't ever say anything about it. He never even thought about it, and Rapinski's on the book. Well, his lawyer said in open court that the funds were not available to him. Okay, I see. I've taken up my time with you. Anyway, your Honor, I did ask for the funds to be released at the district court level prior to the motion to vacate guilty verdicts, and that was denied. So, thank you. Let's put seven minutes on. Oh, thank you, your Honors. She was an advocate. She was excited. We're not going to take away from your time. Thank you so much. I really appreciate it. There's another reason why this case should be sent back, and that is because there was a constructive amendment to the indictment. And I'm going to focus on the superseding indictment, the second superseding indictment. In that second superseding indictment, the grand jury returned the government's theory of the case, which was labeled under the terms the Ponzi scheme. There were three paragraphs in that indictment that set forth the statement of facts and circumstances. Now, that indictment also contained the general language of the statute, which did make reference to omissions. I mean, a Ponzi scheme is, by definition, a scheme and artifice to defraud. Is it not under the mail-and-wire fraud statute? Yes, it is. But the problem here is the constructive amendment occurred because, in the end, the government's theory was based on fraudulent omissions, and that was never alleged anywhere in the superseding indictment. Fraudulent omissions in not telling the investors that their 7% return on the investment was as a result of funds that were received by new investors? Is that what you're saying? Well, no. The real theory ended up being, and this is why there was a constructive amendment, that the parking lot funds were securities that shouldn't have been registered. And as securities, they had Mr. Lindell and Ms. Hawaii had a duty to disclose to their investors all these things that go along with securities. That was not alleged in the indictment at all. And it's not become apparent until later. But the indictment is replete with substantive counts of mail-and-wire fraud in furtherance of the Ponzi scheme, is it not? That's correct. But the problem is that that instruction that the defense requested, that they'd be instructed to find the Ponzi scheme as alleged in the indictment, that was not given in the jury instruction. In fact, the district court... But the district court instructed on conspiracy in 1341 and 1343, didn't it? Yes, yes. But the problem was the district court rejected the defense's specific instruction to instruct on the theory in the indictment, the Ponzi scheme. This case is just like United States v. Shipsy, where in that case the general elements of the statute were alleged, but also there was a statement of facts and circumstances. And the problem was because the jury instruction did not require the jury to find the actual theory that was alleged in the statement of facts and circumstances, the jury was free to find on another theory that the defendants had no notice of. But boil this down for this yea-hoo from Idaho. Really what you're arguing is the instruction would have been okay if we'd have put one word in the instructions, Ponzi. That's correct. That's what you're boiling down. Now, just a minute. I didn't get through. Okay. I'm sorry. Because otherwise the instructions that were provided are just word for word the same. They've just got to have Ponzi in the middle of them. Why is it that the instruction which says proof of the charged scheme would not allow the jury to convict of any chain uncharged? Why is it that proof of the charged scheme, that word language, the charged scheme, when we know exactly what's going on there, why is that any different than having Ponzi in there? It seems to me that that wording, proof of the charged scheme, when there's only question about what the scheme is, there's no question about what was charged, no question about where they're going, no question about what the argument was about. Why doesn't that cover your problem? Because the government also argued in closing for the first time that their real theory was this fraudulent omissions, failure to disclose all these fraudulent omissions that had nothing to do with the Ponzi scheme. Counsel, was the second superseding indictment given to the jury during deliberations so that they could actually look at the language of the charging instrument? I believe there was an abbreviated version of the indictment. Can you take a look at ER 1053, which is the description of the scheme to defraud as alleged by the grand jury? And I can help you out a little bit. It sets out in the first paragraph essentially tracking the language of a conspiracy to engage in mail and wire fraud with the usual language of knowingly and with intent to defraud, devise and intend to devise a scheme and artifice to defraud and to obtain money by means of material faults or fraudulent pretenses, representations, promises, and omissions. And then under a heading labeled the Ponzi scheme, it sets forth in several paragraphs the scheme as alleged in the indictment. So isn't that the scheme that the jury was told they had to deliberate on and return their verdict on? They were directed to find on the charge scheme, but the problem was there's a confusion as to whether there was another charge scheme based on this fraudulent omissions theory. I think what I hear you arguing really is that there was prejudicial spillover from allowing the Hawaii state regulators to come in and to testify for half a day and a 27-day jury trial about the fact that Lindell and his daughter should have been registered as securities brokers in the state of Hawaii. Yes, there was definitely that. But that's not a constructive amendment of the indictment if the indictment charged omissions as part of the scheme and artifice to defraud. So where's the harm here? The harm is that the way the jury instructions went, it allowed the government to get in this theory that the defendants did not have notice of. They did not know they were going to have to defend against failure to disclose securities regulation information. That was nowhere in the indictment. Well, the omissions, as I understand it, included as well the fact that you weren't getting 7% return on the money because we are brilliant investors and we figured out a way to make 10% on the money so we can give 7% to you. They didn't tell them that the interim payments were being made from new investors who were investing more money in the Ponzi scheme, right? Right. That's the omission. Well, that was one omission, and that's an omission that is related to the Ponzi scheme. And that omission under Hawaii state law amounts to engaging in the sale of unregistered securities. So, again, I'm having a hard time understanding, you know, is this prejudicial sufficient to overturn a 27-day jury trial? If I can just respond and then we'll finish. The problem is there was no allegation anywhere in the indictment that Mr. Lindell and Ms. Hoaihai would have to defend against what came out at trial and through the constructive amendment that under the securities regulations they had to disclose all kinds of things about securities. That's a different omission than the omission about, you know, giving statements about the Ponzi scheme. And so that's where there's the harm and the prejudice. And we would recommend that the court vacate and remand the judgments. Thank you. Thank you. Let's hear from the government. May it please the court. Fionnuala Tessier on behalf of the United States. Mr. Lindell was fully and fairly represented at trial by the federal public defender of Hawaii, Peter Wolf, a full-time FPD office investigator and a forensic accounting expert whose fees ran more than $50,000. Despite their vigorous defense, however, Mr. Lindell and his daughter, Holly Hoaihai, were convicted because there was overwhelming evidence at trial that they defrauded their investors in the parking lot scheme. They convinced investors to refinance their homes, to take the equity out of the house, and to hand the money over to the parking lot. They promised a safe and secure investment, making such representations as they had $8 million in safe Wachovia funds paying 10% or 12%. In fact, the money was being used to keep the mortgage store afloat, to personally enrich Mr. Lindell and Ms. Hoaihai, and to pay off prior investors. The victims lost $9 million and, as of sentencing, had received only a quarter of that back in the bankruptcy proceedings. Now, Mr. Lindell still owes $2 million to the bankruptcy trustee, and after trial, the district court entered a $9 million money judgment and a $27,000 specific forfeiture for proceeds contained in the IRA account. That was based on the jury's special verdict that there were $27,000 of fraud proceeds in the account. Now, that finding necessarily means that all of the money in the IRA was involved in a 1957 violation, and that's because the IRA was funded by a rollover from a 401k. So every single dollar in the IRA came from that rollover from the 401k, including the $27,000 in fraud proceeds. Because of that, every single dollar in the IRA was involved in a transaction in more than $10,000 of fraud proceeds, and because of that, every single dollar in the IRA is tainted. Are these claims that you made before trial started, during the trial? Or are these post hoc claims? So the evidence that the rollover contained $27,000 in fraud proceeds, that is evidence from trial, and that's what the jury's special verdict was based on. The allegation that the IRA was involved in a 1957 violation was not made before trial. The first indictment did contain an allegation that the rollover was in furtherance of a 1956 money laundering conspiracy. Of course, 1956 is slightly different than 1957. Okay, so when did you first raise the possibility of the 1957 violation? So it was first raised after trial when Mr. Lindell first requested access to the IRA in order to retain counsel of trust. Okay, so it was not raised until Luis was raised by Lindell. That's correct. And Mr. Lindell made two motions to release the IRA funds. The first motion he made directly after trial in August of 2015 raised some of the same arguments that his later Luis motion raised. He argued that not all of the money in the IRA could be forfeited because only $27,000 was fraud proceeds, and also he made the same allegations about the... And did the district court make findings with respect to the 1957 violation? The district court, in its order denying Mr. Lindell's motion for new trial, did not specifically refer to 1957, but did specifically find that all the funds in the IRA were involved in money laundering and specifically found that the IRA was used to conceal the nature and source of the funds. Okay, so the question I'm getting to is, obviously a new argument was raised once Luis came. This puts the government at some disadvantage because you might have made other arguments that had been raised before trial. But you've now raised a new argument, which Mr. Lindell didn't get an opportunity to raise at least before a jury.  Would that have been decided by the jury? Would that have been decided by the district court? So before trial, it would have been decided by the district court. And actually, this addresses some of the questions Judge Tallman had earlier about what the process would have been before trial. If Mr. Lindell could have sought access to the seized funds by filing a Rule 41 motion for return of seized property, at that point, and Cayley is the Supreme Court decision that explains this distinction, he would not have been able to challenge a grand jury's finding of probable cause to believe that a crime had occurred. But he could have challenged any argument by the government that there's probable cause to believe that the funds that have been seized will be subject to post-trial forfeiture. So that is either traceable to the fraud, if we are proceeding on a proceeds theory, or involved in a money laundering offense. Now, to be sure, the government made some mistakes with respect to the pretrial seizure. And if Mr. Lindell had filed a Rule 41 motion, at that point, in order to retain the funds before trial, we would have either had to file a new civil seizure warrant to then be followed up 90 days with a civil complaint, or if he had filed this after the first superseding indictment was returned that no longer had the 1956 money laundering conspiracy count, we would have had to re-indict again and return with either a 1957 theory or a 1956 theory. So if we thought that Mr. Lindell ought at least have the opportunity of going back to the district court and press this in a new argument, is the government going to come back in and say these funds would not have been available prior to trial? If he had raised it before trial, we certainly, at that point, would have either released the funds, but more likely sent it. And if we were to send this back now? Your Honor, I don't believe there's any need to send this back. Well, I understand that's going to be your argument. I want you to assume the premise that we send it back. If we send it back to the district court to make certain findings, make inquiries of Mr. Hayakawa and Mr. Wolf and Mr. Lindell and so on, as to what their intention was and what they understood and so on, then is the government asking to be free to raise the argument that these funds would not have been available before trial anyway? So that's exactly the argument we would make, and that's the argument that we did make when he did raise this in his Rule 33 motion. The district judge has already ruled on all of this. Now, it's up on plain error review because Mr. Lindell did not raise these arguments before trial, and a post-trial motion cannot revive an argument that should have been made before trial. But he did raise this in a Rule 33 motion, and so this is not a plain error case where you might go back to the district court and ask the district court to rule in the first instance because the district court has already explained and did rule that these funds were, in fact, tainted, and that's why Louise did not apply. So the district court made several rulings. First of all, that the funds were untainted, but also found that Mr. Lindell had not met what is his burden at this point of showing that they would have been available to hire counsel of choice. Nor has he shown that he ever intended to hire counsel of choice. In fact, the vast majority of the evidence on the record here is to the contrary. I think most telling in this respect is the fact that after trial, he did make a motion to access the IRA, but it was not for the purpose of hiring new counsel, even though the very same day that he filed a motion to access the IRA funds to pay for the living expenses of his wife and child, he also asked for new counsel. He asked for new counsel again. He was appointed new counsel, and he asked for counsel again, a third counsel, two months later. And at a hearing to determine whether or not Mr. Lindell could get a third counsel, the district court said to him, you can't keep running through counsel. You can't get counsel of choice when it's appointed counsel. And even though there was at that point a motion pending to release funds in the IRA, he at that point never said, well, I would like to be able to hire counsel, but I can't because the money is tied up in the IRA. I believe at some point in your briefing you mentioned there might be some restrictions through the bankruptcy. That's correct, Your Honor. And so could Mr. Lindell have accessed these funds? So independent of any restrictions because they were tainted in some way or connected with the crime. And the district court ruled on this as well. The district court said that it was not clear that he would have had access to the funds because of the rights of the bankruptcy trustee. So the IRA was exempted from Mr. Lindell's stipulated settlement. It was available to him only in connection with retirement. That's correct. But hadn't he attained the appropriate age of retirement? He had retained the appropriate age of retirement at this point. At that point, do we get to judge how he spends his retirement money, whether he spends it on golf club memberships or on attorneys? Well, I don't know that you need to at this point because, of course, the burden is on Mr. Lindell to show a clear or obvious Sixth Amendment violation. And so he has to show that it's clear or obvious that the fund would have been available. Right, but you've made an argument that there would have been an additional legal impediment to him obtaining these funds by virtue of the bankruptcy settlement. That's correct. What I'm trying to figure out is the bankruptcy settlement said, yes, you can't access the IRA except in connection with the law that governs IRAs, which means it's exempt for purposes of retirement. Since he was retirement eligible, couldn't he have accessed these funds for any purpose? Your Honor, I'm not a bankruptcy expert. But you made the argument. Are you going to defend it or are you going to let it go? I made the argument based on the bankruptcy trustee's representation, that the bankruptcy trustee would have viewed the money as garnishable if it had been withdrawn for the purposes of hiring counsel. Now, whether or not the bankruptcy trustee would have been ultimately successful in garnishing those funds, we don't know. I think we do know from that declaration of the bankruptcy trustee that there would have been at least some collateral litigation, perhaps in the bankruptcy court, over the availability of those funds. And the reason why I think that's important is because, again, at this point, it's Mr. Lindell's burden to show that the funds would have been available. And in light of that complication and others, he cannot show that the funds would have been available. But it seems to me, and correct me if I'm wrong, it seems to me that if we go, if lease is the law, and it is a constitutional error for those funds to have been seized because some were not untainted, some were not tainted, that it was a constitutional error, it implicated a structural right, then it would seem to me that the last two prongs of plain error review are met, that there would have been substantial rights affected and it would undermine the fairness of the criminal proceedings as a whole. That I take from Chavez Cuevas. So I'm only looking at the first two, whether there was error and whether it was plain. And it seems to me that if I'm looking at whether there's error and whether it's plain, then I have to look at whether the funds were tainted or they weren't, that's first, and then whether they were needed to retain the counsel of choice. So I guess I'm figuring out why shouldn't I send this back. It seems to me the only reason I can is to say they were all tainted, which is one of your arguments, but if I don't swallow that, I don't know whether they were needed for counsel of choice. Why wouldn't I let the judge have another hearing on that? So a few things, Your Honor. First of all, the judge did already have extensive briefing on this issue and found that Luis didn't apply, not just because the funds were tainted, which they were, but also because Mr. Lindell hadn't shown that they were necessary, available, or sufficient to hire counsel of choice. Now I'd note structural error requires deprivation of the right to counsel of choice, requires deprivation throughout the entire judicial proceedings. It's not enough to say I would have hired counsel of choice for one hearing or one motion. And I apologize for not mentioning this in our brief, but Walters, which is 309 F3rd 593, specifically discusses this with respect to sentencing, since the defendant's raised for the first time in the reply brief an argument of the deprivation of right to counsel at sentencing. Deprivation of right to counsel of choice, not deprivation of right to counsel, but of choice, for just a small portion of the proceedings is not structural error because it does not affect the entire criminal proceeding. It's reviewed for harmlessness. The question is whether or not the defendant was fully and fairly represented. And of course, the defendant was fully and fairly represented at all stages of the proceedings here. So I don't think you need to remand it, either for the question of whether or not the funds were tainted or whether or not they were sufficient or would have been available to hire counsel of choice for the entire proceedings, since the judge already ruled on that. I would also note that you are correct that under this circuit's case law, structural error necessarily meets the third prong. I don't believe the Ninth Circuit has ever held that structural error necessarily meets the fourth prong. Well, but Cuevas says where the error is constitutional in nature and implicates a structural right, the error affects the substantial right and undermines the fairness of a criminal proceeding. That's the fourth prong. So I disagree with Your Honor. I don't believe that's quite the fourth prong. A couple of things to note. First, Chavez-Cuevas was actually not a structural error case. The court found no structural error there. I understand. So the court could not have been... I just read their language. That's true. The court could not have been holding that it always satisfies the fourth prong because, of course, there wasn't a structural error there. Yamashiro, which is the case that says that it always satisfies the third prong, and that's a holding in that case, notably did not go on to say that it also always satisfies the fourth prong. It only said that in that particular case it satisfies the fourth prong. Now, the language that Chavez-Cuevas has cited that you refer to is from Davila. Davila is a Supreme Court case that's talking about how you assess preserved structural error, not unpreserved structural error. And it is discussing whether or not you can analyze harmlessness, not whether or not you can analyze the fairness of judicial proceedings as a whole. I think what Davila is talking about is how do we assess how structural error affected this particular case. But that's not what the fourth prong is about. The third prong is about how did this error affect this particular case. The fourth prong is about how does this error affect the judicial system as a whole, not the judicial proceedings, but judicial proceedings writ large. And I think it would undermine the public reputation of judicial proceedings as a whole to reverse in this case. Because the defendant had every opportunity to argue that he needed access to these funds to hire counsel of choice. He never did. He was fully and fairly represented at trial by the federal public defender and two other individuals, including an expensive expert. The evidence against him at trial was simply overwhelming. To reverse would mean that we would have to have a new trial where the many victims of Mr. Lindell's fraud would have to subject themselves to testimony and cross-examination yet again. I don't think it would undermine the integrity of the judicial system to affirm here. I think the opposite. I think it would undermine the integrity of the judicial system to reverse. If the court has no further questions. Thank you very much. Thank you very much. Ms. Panagakos, I'll give you some time. Thank you, Your Honor. First of all, United States v. Riccio, 371 F. 3rd, 1093 at note 7. That's cited in the government's brief. We note that structural error is particularly likely to satisfy Olano's fourth prong. In fact, and Olano, they're talking about structural error in the context of plain error. In fact, it is difficult to imagine a case where structural error will not satisfy Olano's fourth requirement. As far as not showing that the funds were available, the settlement agreement, which is an excerpt of record, the page with regard to retention of assets, is at 375. It says that Mr. Lindell can retain his retirement account except for the two deposits in July 2007, which are the same $27,000 that's covered by the special forfeiture verdict. There's no restrictions on his use of the money. It doesn't say anything about use for retirement purposes only. Mr. Klevansky's claim that he's going to go after it has no basis in fact or law. Counsel, what do we do with the district court's finding at ER 31 in the post-trial order that the funds at issue here are tainted? The tainted? Okay. Tainted means forfeitable. Well, but tainted takes it out of the Luis... Well, but the finding is an error of law. He's saying it's tainted as property involved in a money laundering offense. That is not charged in the indictment that he went to trial on. There was never a civil forfeiture complaint.  When you look at the language of Luis, it says that taint, innocent property, is property not connected to the charged crime. The dissent says that Luis is protecting assets that are not derived from the charged crime. Luis is distinguishing Monsanto and Kaplan and Drysdale, which talked about tainted assets being forfeitable assets. Like government counsel said, this 1957 theory was never raised until after Luis. It's a chicken and egg problem. Because it wasn't raised before trial, there wasn't an opportunity to present this question to the district court. And so we're stuck in this situation now of trying to sort of go back and ask, what would the district court and the government have done, had a timely objection? Well, but it's not up to the government. It wasn't up to... I understand that there's issues with... whatever. The government had a duty to do this right. They filed the affidavit which allowed the seizure of untainted funds. The seizure warrant listed proceeds and funds... They obtained an order freezing an account that they were able to trace some of the proceeds to... Right, but they cited... and they also identified funds which were not proceeds. And they cited 1984 as the basis to seize the pre-proceeds money. And 1984 was time-barred, and it was just a blatant misapplication of that statute in the warrant, which prevented the district court judge from seeing it. So they were untainted funds when they were seized. Had a timely attack been made, then that could have been addressed by the district court. Okay, but the government has a duty to do it right. Okay, but counsel, so if everybody's got a duty to get this right, and we were to just send it back, let's suppose we just said, structural error, everything satisfied, we just need to have a complete do-over. Doesn't the government now get the opportunity to do all of this over again? In which case you might be right back in the same... I don't think the entire account is subject to forfeiture. But you would have an opportunity to argue that. But I'm guessing that if we send this back, the government is going to say, okay, well we're going to approach this a little differently. We know more than we knew before, and we'll get to argue this. We see it a little differently, and we're going to argue it differently. I mean, it just seems like it just opens everything back up. Well, but there are errors that were clear and plain. What happens if we get to the pretrial situation in which the district court says, I think these funds have been properly seized and can be held, and so now, Mr. Lindell, you're entitled to appointed counsel once again. So we go back and we have trial all over again with new appointed counsel? Well, then I guess you would have to remand for a taint determination, but I think the record shows that the non-proceeds are untainted. The government chose to drop its money laundering theory. It was in the original indictment. They chose to drop it. But had he made a timely motion, there was time to supersede the indictment. And had they complied with their affirmative statutory duty under 983A3B that didn't require the defendant to ask for anything, they were under a duty to return the property under that statute because they did not comply. But he never filed a motion asking for the property? But the statute doesn't require them to file a motion. Well, I think we're just going round and round. Right. Well, but the clear error is untainted funds were seized pursuant to a time barred 984. They never became subject to forfeiture under the theory that's alleged now. The statute of limitations precludes them from doing it now. The $20,000 July 2007 transaction? Twenty-seven, though. Well, there was two, 20 and seven. The 20 was charged in the first superseding indictment, and it was dismissed because it was barred by statute of limitations. So they chose not to make this argument in a timely fashion. And that's – thank you, Your Honor. Okay. I do want to thank counsel. You were extremely well prepared in this last case. It's a very complicated matter. We appreciate both the vigor and the quality of counsel's argument in the last one. And with that, we have concluded our oral argument calendar for the day. So for the benefit of students and faculty and anybody else from the public who is interested, we are going to adjourn to another room where we are going to confer over the cases. We will not be making any announcements about anything today, but we are just doing our ordinary duty. Our law clerks are here and are going to talk with anybody who is interested about what it's like to work for us. This is your opportunity to ask questions outside of our presence of people who are knowledgeable about everything. And then we come back in and we'll take questions for a little bit with anybody who wishes to stick around. So with that, the court is adjourned. All rise.
judges: Tallman, Bybee, N.R. Smith